IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. FANSTEEL METALS, INC. F/K/A FMRI, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. ___ CIV 22-366-KEW |
| | ) | |
| 1. CITIGROUP INC.; and | ) | |
| 2. UNION CARBIDE CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, Fansteel Metals, Inc. f/k/a FMRI, Inc., on its own behalf and as successor and assignee of Fansteel, Inc. (hereinafter, "FMRI" or "Plaintiff"), by and through its counsel, The Justis Law Firm LLC, and for its Complaint ("Complaint") against Defendants Citigroup Inc. ("Citigroup") and Union Carbide Corporation ("Union Carbide"), alleges as follows:

### I.      STATEMENT OF THE CASE

1.      This is a civil action pursuant to the provisions of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.* ("CERCLA"), relating to the release and/or threatened release of hazardous substances from the former Fansteel, Inc. facility located at 10 Tantalum Place, Muskogee County, Muskogee, Oklahoma, as well as any area where hazardous substances that migrated from the Fansteel Site have come to be located (collectively, the "Fansteel Site").

2.      This case arises out of the same set of facts and circumstances as the related case currently pending before this Court styled *Fansteel Metals, Inc. f/k/a FMRI, Inc. v. Muskogee City-County Port Authority, et al.*, No. 21-CV-102 RAW (E.D. Okla.).

3.      The hazardous substances at the Fansteel Site have contaminated the soil, sediment,

surface and ground water.

4.      The hazardous substances at the Fansteel Site have threatened the public health and the environment.

5.      The Muskogee City-County Port Authority currently owns a portion of the Fansteel Site and each of the named Vendor Defendants arranged for, or succeeded to the liability of their predecessor who arranged for, the treatment and disposal of materials containing the hazardous substances that remain at the Fansteel Site.

6.      FMRI brings this action on its own behalf and on behalf of Fansteel, Inc. ("Fansteel"), as Assignee to that certain Assignment of Claims agreement entered into between FMRI and Fansteel.

7.      FMRI seeks contribution from Citigroup and Union Carbide pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for their respective equitable shares of past and future response costs incurred and to be incurred by FMRI for response activities undertaken and to be undertaken at the Fansteel Site, along with a declaration as to Citigroup and Union's respective liability and an allocation of past and future response costs among all parties.

## II.      JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), providing federal jurisdiction over controversies arising under CERCLA, and pursuant to 28 U.S.C. § 1331, providing federal jurisdiction over controversies involving questions of federal law.

9.      The Court also has jurisdiction over the request for declaratory relief under Section 113 of CERCLA, 42 U.S.C. § 9613 and 28 U.S.C. §§ 2201 and 2202.

10.      Venue is proper in this district pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b), because the release or threatened release of hazardous

substances that give rise to this action occurred and/or are occurring at or from the Fansteel Site, located in this judicial district.

## III.    FACTUAL ALLEGATIONS

### A.    Allegations Common to All Claims

11.    The Fansteel Site consists of approximately 110 acres located at 10 Tantalum Place in Muskogee, Muskogee County, Oklahoma.

12.    The portions of Fansteel Site are currently owned by three distinct entities: (a) Fansteel owns Parcels B and D, comprising approximately 80 acres, (b) FMRI owns Parcel C, comprising approximately 10 acres, and (c) the Muskogee City-County Port Authority owns Parcel A, comprising approximately 20 acres.

13.    Fansteel constructed a metal processing facility that was completed in 1957, which remains at the Fansteel Site.

14.    Fansteel began operations shortly after construction.

15.    Fansteel continued the operations of its metal processing facility at the Fansteel Site over the next 30 years, closing in 1990.

16.    Operations at the Fansteel Site included, in part, the treatment and processing of raw materials consisting of tin slags and metal-bearing ores that contained tantalum, columbium and other hazardous substances, including radiological substances, to produce tantalum-bearing and columbium-bearing products.

17.    The waste residual material containing hazardous substances generated from the metal processing operations at the Fansteel Site was treated and disposed of onsite in up to nine storage and wastewater treatment ponds, most of which remains in, on or at the Fansteel Site today.

18.    The metal processing operations at the Fansteel Site generated a significant amount of waste residuals.

19.    The waste residual material included radiological and non-radiological hazardous substances.

20.    After the initial processing of the raw materials in a digestion process, the waste residual materials generated were discharged to onsite storage ponds referred to as "Work-In-Progress" ("WIP") ponds.

21.    The intermediate product that was generated from the digestion process was then further processed to obtain the tantalum and columbium metal.

22.    The waste residual material generated from processing the intermediate product from the digestion process was treated and discharged to wastewater treatment ponds onsite referred to as the "CAF" ("CAF") ponds.

23.    The WIP ponds and the CAF ponds were constructed over various years.

24.    Some of the WIP ponds and the CAF ponds were earthen-lined, while others were lined with a composite material.

25.    Several significant releases of materials from the WIP ponds and the CAF ponds occurred over their years of operation thereby impacting the groundwater and soil onsite.

26.    Because the raw materials processed by Fansteel were considered "source material" under the Atomic Energy Act and Nuclear Regulatory Commission's ("NRC") regulations, the NRC issued Fansteel a Radioactive Material license beginning in 1967 (the "NRC License").

27.    In addition, because the CAF ponds discharged to the Arkansas River adjacent to the Fansteel Site, the Oklahoma Department of Environmental Quality ("ODEQ") issued Fansteel a National Pollution Discharge Elimination System ("NPDES") permit.

28.    Fansteel ceased operations in approximately 1990.

29.    In 1993, Fansteel conducted a remedial assessment of the entire Fansteel Site (the

"1993 Remedial Assessment").

30.     The 1993 Remedial Assessment indicated that the soil and groundwater in, on or at the Fansteel Site was contaminated with radiological and non-radiological substances.

31.     From 1990 until 2002, Fansteel prepared and filed at least two decommissioning plans with the NRC, both of which the NRC rejected.

32.     Following NRC's rejection of Fansteel's two decommissioning plans, Fansteel filed for bankruptcy protection in January of 2002.

33.     Fansteel emerged from bankruptcy in 2003 with an approved decommissioning plan ("DP") from the NRC, as well as an approved Plan of Reorganization (the "2003 Plan of Reorganization").

34.     As part of the 2003 Plan of Reorganization, FMRI was created as a single-purpose entity and charged with the implementation of the approved DP.

35.     As part of Fansteel's 2003 Plan of Reorganization, Fansteel's NRC License and its NPDES permit were transferred to FMRI.

36.     FMRI's NRC License required it to decommission the Fansteel Site.

37.     FMRI is currently implementing the approved DP.

38.     ODEQ requires FMRI to address releases of non-radiological hazardous substances in, on or at the Fansteel Site.

39.     Financial assurance funding for the required work for the DP at the Fansteel Site was provided by Fansteel through a series of unsecured promissory notes (the "Financial Assurance Notes").

40.     FMRI began implementation of the DP in 2005, but as a result of disagreements with its contractor, the contract with the contractor was terminated and litigated until 2010.

41.     In 2006, as a result of a groundwater investigation conducted by ODEQ on Parcel A owned by the Port, an extensive chlorinated solvent groundwater contamination plume was discovered.

42.     FMRI re-started implementation of the DP in 2010.

43.     In December 2013, a balloon payment required from Fansteel under its Financial Assurance Notes came due.

44.     After Fansteel was unable to make the balloon payment, governmental authorities declared Fansteel in default of its Financial Assurance Notes.

45.     As a result of the default, Fansteel, FMRI and the Department of Justice ("DOJ"), NRC and ODEQ, entered into a series of forbearance agreements, which strictly controlled Fansteel's assets so that funds could be paid to FMRI to continue to implement the DP.

46.     Thereafter, Fansteel and the DOJ, NRC and ODEQ attempted to reach a long-term forbearance agreement, but these negotiations ultimately failed.

47.     After the negotiations to reach a long-term forbearance agreement failed, Fansteel filed for bankruptcy protection in September 2016 ("Second Bankruptcy").

48.     In Fansteel's Second Bankruptcy, Fansteel and FMRI entered into an Environmental Settlement Agreement ("ESA") with the United States on behalf of the NRC, and Environmental Protection Agency ("EPA") and the ODEQ which required, *inter alia*, that FMRI complete the investigation and remediation of the Fansteel Site as required by the NRC, EPA and ODEQ.

49.     The ESA required that FMRI pursue all potentially responsible parties ("PRPs") under CERCLA for their share of Fansteel's and FMRI's response costs incurred and to be incurred to investigate and remediate the Fansteel Site.

50.   In the Second Bankruptcy, the Bankruptcy Court approved the ESA on June 2, 2020 and Fansteel's Plan of Liquidation on August 6, 2020.

51.   To date, FMRI and Fansteel have incurred in excess of $25 million in response costs to perform various required response activities at the Fansteel Site ("Past Response Costs").

52.   The Past Response Costs were necessary to address the release and/or threatened release of hazardous substances in, on or at the Fansteel Site.

53.   The Past Response Costs were required by EPA, the NRC and ODEQ and as such are consistent with the National Contingency Plan ("NCP").

54.   In addition, Fansteel and FMRI have voluntarily incurred additional recoverable response costs, including attorney's fees and expenses to search for all PRPs associated with the Fansteel Site and to perform administrative functions, that are closely tied to the response activities at the Fansteel Site, which FMRI is also entitled to recover against parties liable under CERCLA ("Additional Response Costs").

55.   FMRI will continue to incur response costs to conduct response actions at the Fansteel Site as required by the EPA, ODEQ and the NRC, consistent with the NCP ("Future Response Costs"), in addition to the Past Response Costs and Additional Response Costs already incurred.

56.   The Past Response Costs, Additional Response Costs and Future Response Costs constitute all of the response costs that Fansteel and FMRI have incurred or will incur in connection with the investigation and remediation of the Fansteel Site ("Total Response Costs").

57.   The Muskogee City-County Port Authority ("Port") purchased 20 acres of the Fansteel Site in June 1999, and is the current owner of approximately 20 acres, described as Parcel A, of the Fansteel Site.

58.     Historically, Parcel A (and the adjoining Parcel B) of the Fansteel Site were included, along with Parcels C and D, in Fansteel's NRC License.

59.     In order to remove Parcels A (and B) from the NRC License, so that these parcels could be sold, the NRC required that Fansteel perform a radiological assessment of these two parcels for NRC review to determine whether, in the NRC's opinion, Parcels A (and B) could be removed from the NRC License.

60.     In 1993, Fansteel's consultant, Earth Sciences Consultants, Inc. ("ESC") performed the 1993 Remedial Assessment.

61.     A portion of the 1993 Remedial Assessment focused on the Northwest Property (Parcels A and B) that included only limited soil and groundwater data and radiation surveys, and was summarized in a separate report that Fansteel submitted to the NRC for review and approval.

62.     Based upon the data presented in the 1993 Remedial Assessment related to the Northwest Property, the NRC removed Parcels A (and B) from Fansteel's NRC License by Amendment #5 dated March 27, 1997.

63.     In early 1999, the Port and Fansteel began negotiations related to the Port's purchase of Parcel A.

64.     At the time of these negotiations, ESC had been Fansteel's environmental consultant for almost 10 years providing Fansteel with the necessary technical assistance to prepare proposals for a Decommissioning Plan that was required by the NRC.

65.     The work ESC performed for Fansteel included the investigation of the nature and extent of any radiological and non-radiological contamination present at the Fansteel Site.

66.     ESC provided technical assistance to Fansteel regarding compliance with Fansteel's NDPES discharge permit issued to Fansteel by ODEQ.

67.     ESC was Fansteel's technical representative interfacing with both the NRC and ODEQ and participating in the negotiations with the NRC and ODEQ over the scope of the investigation and remediation of any radiological and non-radiological contamination present at the Fansteel Site.

68.     In May 1999, the Port engaged ESC to conduct an independent environmental assessment of Parcel A to satisfy the "all appropriate inquiry" ("AAI") diligence required to qualify for the innocent landowner defense to CERCLA liability.

69.     Upon information and belief, at the time the Port engaged ESC in May 1999, the Port was aware that ESC had served as Fansteel's consultant.

70.     ESC prepared a report for the Port entitled, "Technical Report Phase I Environmental Site Assessment Update, Northwest Property Area, Muskogee, Muskogee County Oklahoma" dated May 17, 1999 ("Technical Report").

71.     Upon information and belief, the Technical Report was intended to satisfy AAI criteria.[1]

72.     ESC did not prepare the Technical Report in accordance with the AAI criteria.

73.     ESC's Technical Report was an update of a portion of its 1993 Remedial Assessment.

74.     ESC's Technical Report was not a Phase I Environmental Site Assessment that could be used to satisfy CERCLA's AAI criteria.

75.     In concluding that Parcel A "did not present a significant environmental concern,"

---

[1] The AAI standard that was customarily used as the AAI practice for commercial/ industrial property in May 1999 was the American Society for Testing and Materials ("ASTM") Standard Practice for Environmental Site Assessment: Phase I Environmental Assessment Process, designated as ASTM E 1527-97.

ESC's Technical Report relied upon the very limited soil and groundwater data generated several years prior as part of its 1993 Remedial Assessment for Fansteel.

76.     Most of the soil and groundwater data ESC relied upon for the Technical Report did not include any data on volatile organic compounds, including chlorinated solvents.

77.     The Port purchased the property from Fansteel in June 1999.

78.     Seven years later, in 2006, an extensive chlorinated solvent groundwater plume under Parcel A was discovered as a result of a limited soil and groundwater investigation performed by ODEQ on behalf of the Port in connection with the Port's potential purchase of Parcel B.

79.     ESC's reliance on limited sampling data evidenced that ESC's Technical Report did not satisfy the requirements of a Phase I Environmental Site Assessment appropriate to meet AAI criteria.

80.     A satisfactory AAI analysis would have recommended a more extensive soil and groundwater sampling program, to determine whether Parcel A had been impacted by the activities conducted on the adjacent parcels comprising the Fansteel Site.

81.     On information and belief, the Port has not met AAI criteria to satisfy the requirements of the innocent landowner defense under CERCLA at Section 107(b)(3) and Section 101(35), 42 U.S.C. § 9607(b)(3) and § 9601(35).

82.     Even after the Port had actual knowledge of the extensive groundwater contamination plume underneath its property, based upon information and belief, the Port has to this day not taken any reasonable steps to stop the continuing release of the chlorinated solvents, to prevent any further release of chlorinated solvents throughout its property, or to prevent or limit exposure to individuals or the environment from the previously released chlorinated solvents.

83.     On information and belief, the Port has not exercised due care with respect to the chlorinated solvents present in the groundwater on its property, taking into consideration the characteristics of the chlorinated solvents present in the groundwater, in light of all the relevant facts and circumstances.

84.     On information and belief, the Port did not take any precautions against any foreseeable acts or omissions of Fansteel and the consequences that could foreseeably result from such acts or omissions with respect to the contaminated groundwater water.

85.     Even after the Port had actual knowledge of the chlorinated solvent plume on its property in 2006, on information and belief, the Port did not take appropriate and reasonable actions.

**B.      Allegations Common to All Claims Against Citigroup and Union Carbide**

86.     Fansteel purchased raw materials consisting of tin slags or metal-bearing ores directly from Citigroup's predecessor and Union Carbide.

87.     The purchase arrangements with Citigroup's predecessor and Union Carbide required that the raw material be weighed and sampled by a neutral referee to determine the weight and percentage of tantalum and/or columbium in the raw material.

88.     After Fansteel and Citigroup's predecessor and Fansteel and Union Carbide agreed on the weight and percentage content, the amount of tantalum and/or columbium in the material could be determined.

89.     Fansteel paid Citigroup's predecessor and Union Carbide the agreed-upon price per pound for either the tantalum or columbium content within the raw material.

90.     Fansteel did not pay either Citigroup's predecessor or Union Carbide any amount for the residual waste material in the raw material, which sometimes accounted for up to 85% of the raw material delivered.

91.     The residual waste material from Citigroup's predecessor and Union Carbide was treated and disposed by Fansteel in the onsite ponds, and today remains in, on, or at the Fansteel Site.

**A.    Allegations Specific to the Parties**

**1.    *The Plaintiff***

92.     Fansteel Metals, Inc. f/k/a FMRI, Inc. is a Delaware corporation formed as a special purpose entity as part of the Fansteel 2002 bankruptcy to fulfill the obligations required under its NRC License and its NPDES permit.

**2.    *The Defendants***

93.     Each Defendant arranged for the treatment and disposal of hazardous substances delivered to the Fansteel Site that did not include tantalum and/or columbium, consisting of the residual waste material that was disposed of in the nine onsite ponds and which constitute a threatened release by remaining in, on or at the Fansteel Site, requiring a response.

94.     The hazardous substances each Defendant arranged for the treatment and disposal of at the Fansteel Site included at least the following: aluminum; arsenic; chromium; cobalt; copper; lead; lead monoxide; manganese; manganese oxide; mercury; nickel; silver; thorium dioxide; and zinc.

**a.    *Citigroup, Successor to Philipp Brothers, Inc.***

95.     According to the records maintained and in the possession of Fansteel relating to Citigroup's predecessor, Philipp Brothers, Inc. ("Philipp Brothers"), from at least 1976 to 1987, Philipp Brothers entered into multiple agreements with Fansteel to sell and arrange for delivery materials containing hazardous substances owned or possessed by Philipp Brothers to the Fansteel Site for treatment and disposal.

96.     These records, comprising contracts, memoranda, communications, shipping

transport records and invoices, reflect Philipp Brothers arranged for the supply of materials containing hazardous substances that were arranged for treatment and for disposal and that were arranged for transport for treatment and for disposal at the Fansteel Site for conversion (treatment) by Fansteel into useful products, namely the tantalum and columbium that Fansteel was able to extract from Philipp Brothers-arranged materials for which content Fansteel paid Philipp Brothers.

97.     These records reflect arrangements through which title to the entire shipment of Philipp Brothers-arranged materials were transferred by Philipp Brothers to Fansteel, the payment by Fansteel being based upon the weight of tantalum and columbium Fansteel was able to extract and convert from Philipp Brothers-arranged materials, and the lack of arrangements for the return of residues after treatment of Philipp Brothers-arranged materials by Fansteel, reflect Philipp Brothers' understanding that the residues were not a useful product and reflect Philipp Brothers' intent to arrange for transport for Fansteel's treatment and disposal of materials containing hazardous substances at the Fansteel Site, which records comprise at least of the following arrangements detailed in Paragraph Nos. 98-124 *infra* without further discovery.

98.     According to references in Phillip Brothers invoices dated December 15, 1976 and February 15, 1977, Philipp Brothers sold and arranged for delivery of 7,669.91 metric tons of tantalum slags to Fansteel for processing at the Fansteel Site under Contract 106002-S/106300-S, presumably before December 15, 1976 since the invoices were for reimbursement of ocean freight charges.

99.     According to Invoice No. 11-S-73254 dated January 6, 1977, Philipp Brothers sold and arranged for the delivery of 105.000 metric tons of tantalum slags to Fansteel for processing at the Fansteel Site, which contained at least 1.6% (or 3,703.79 lbs.) of tantalum

pentoxide.

100.    According to Invoice No. 11-S-73244 dated January 6, 1977, Philipp Brothers sold and arranged for the delivery of 4,501.814 metric tons of Malaysian tantalum bearing tin slags to Fansteel for processing at the Fansteel Site, which contained at least 2.8% (or 277,891.57 lbs.) of tantalum pentoxide.

101.    According to Invoice No. 11-S-73459 dated January 6, 1977, Philipp Brothers sold and arranged for the delivery of 2,870.391 metric tons of Malaysian tantalum bearing tin slags produced by Straits to Fansteel for processing at the Fansteel Site, which contained at least 2.7% (or 170,857.73 lbs.) of tantalum pentoxide.

102.    According to Invoice No. 11-S-73462 dated January 6, 1977, Philipp Brothers sold and arranged for the delivery of 279 drums of Malaysian tantalum bearing tin slags to Fansteel for processing at the Fansteel Site, which contained at least 1.8% (or 4007.97 lbs.) of tantalum pentoxide.

103.    According to a May 28, 1980 Fansteel purchase order to Philipp Brothers, reference no. 71711, Philipp Brothers sold and arranged for the delivery of 20 metric tons of tin slags to Fansteel for processing at the Fansteel Site, which contained approximately 6.65% of tantalum pentoxide, 5.3% of titanium dioxide, and 12.6% of tin (IV) oxide.

104.    According to Invoice No. 11-S-33611 dated June 26, 1980, Philipp Brothers sold and arranged for the delivery of 2,069 bags and 236 drums of struverite to Fansteel for processing at the Fansteel Site, which contained at least 40,380.16 lbs. of tantalum pentoxide.

105.    According to Invoice No. 11-S-33614 dated June 26, 1980, Philipp Brothers sold and arranged for the delivery of 1340 bags of struverite to Fansteel for processing at the Fansteel Site, which contained at least 10.084% (or 8,955.57 lbs.) of tantalum pentoxide.

106.    According to Invoice No. 11-S-33851 dated July 2, 1980, Philipp Brothers sold and arranged for the delivery of 375 bags of tantalum containing tin slags to Fansteel for processing at the Fansteel Site, which contained at least 2,706.75 lbs. of tantalum pentoxide.

107.    According to Invoice No. 11-S-33726 dated July 3, 1980, Philipp Brothers sold and arranged for the delivery of 130 drums of struverite to Fansteel for processing at the Fansteel Site, which contained at least 10,373.11 lbs. of tantalum pentoxide.

108.    According to Invoice No. 11-S-36104 dated August 4, 1980, Philipp Brothers sold and arranged for the delivery of 321 bags of struverite to Fansteel for processing at the Fansteel Site, which contained at least 10.20% (or 2,264.15 lbs.) of tantalum pentoxide.

109.    According to Invoice No. 11-S-36954 dated August 6, 1980, Philipp Brothers sold and arranged for the delivery of 117 bags of struverite to Fansteel for processing at the Fansteel Site, which contained at least 9.61% (or 1,041.30 lbs.) of tantalum pentoxide.

110.    According to Invoice No. 11-S-36971 dated August 22, 1980, Philipp Brothers sold and arranged for the delivery of two lots of struverite to Fansteel for processing at the Fansteel Site, which lots contained at least 14,179.44 lbs. and 25,142.84 lbs. of tantalum pentoxide, respectively, for a total of 39,322.28 lbs. of tantalum pentoxide.

111.    According to Invoice No. 11-S-38002 dated September 9, 1980, Philipp Brothers sold and arranged for the delivery of 321 bags of struverite to Fansteel for processing at the Fansteel Site, which contained at least 2,330.74 lbs. of tantalum pentoxide.

112.    According to Invoice No. 11-S-48063 dated December 29, 1980, Philipp Brothers sold and arranged for the delivery of various loads of struverite to Fansteel for processing at the Fansteel Site, which contained at least 19,766.82 lbs. of tantalum pentoxide.

113.    According to Invoice No. 11-S-52422 dated March 3, 1981, Philipp Brothers sold

and arranged for the delivery of various loads of struverite to Fansteel for processing at the Fansteel Site, which contained at least 19,766.82 lbs. of tantalum pentoxide.

114.    According to Contract No. 820833-S between Fansteel and Philipp Brothers dated June 14, 1984, Philipp Brothers agreed to sell and arrange for delivery to Fansteel tantalum raw materials for processing at the Fansteel Site, which contained approximately 50,000 lbs. of tantalum pentoxide in struverite and another 50,000 lbs. of tantalum pentoxide in natural tantalite concentrates, with the struverite having at least 7.5% of tantalum pentoxide for any one lot and 9% minimum tantalum pentoxide for the entire quantity, 60% maximum titanium dioxide, and 0.75% maximum for uranium oxide and thalium dioxide combined; and with the natural tantalite concentrates having at least 15% of tantalum pentoxide for any one lot and 25% minimum tantalum pentoxide for the entire quantity, 55% maximum combined tantalum pentoxide and columbium pentoxide, 8% maximum titanium dioxide, 10% maximum tin (IV) oxide, and 0.50% maximum for uranium oxide and thalium dioxide combined.

115.    According to Contract No. 002652-S between Fansteel and Philipp Brothers dated June 14, 1984, Philipp Brothers agreed to sell and arrange for delivery to Fansteel tantalum raw materials for processing at the Fansteel Site, which contained approximately 50,000 lbs. of tantalum pentoxide in Thaisarco and African slags, with the Thaisarco slags containing approximately 28,000 lbs. tantalum pentoxide and having at least 14.0% minimum of tantalum pentoxide for the entire quantity and any one lot, 7.0% minimum columbium pentoxide, and 0.50% maximum for uranium oxide and thalium dioxide combined; and with the African slags containing approximately 22,000 lbs. tantalum pentoxide and having at least 9.0% minimum of tantalum pentoxide for the entire quantity and any one lot, and 0.50% maximum for uranium oxide and thalium dioxide combined.

116.    According to Invoice No. 11-S-40444 dated July 2, 1984, Philipp Brothers sold and arranged for the delivery of 1350 bags of struverite ore, which contained 9,475.21 lbs. of tantalum pentoxide, and another 152 drums and 2812 drums of struverite ore, which contained 41,515.37 lbs. of tantalum pentoxide, all of which to Fansteel for processing at the Fansteel Site.

117.    According to Contract No. 004030-S between Fansteel and Philipp Brothers dated August 10, 1984, Philipp Brothers agreed to sell and arrange for delivery to Fansteel for processing at the Fansteel Site approximately 50,000 lbs. of tantalum pentoxide in artificial tantalum concentrates, produced by "GFE", having the following specifications: minimum 20% of tantalum pentoxide; minimum 20% of columbium pentoxide; minimum 40% of chloroperoxidase; and 0.50% maximum for uranium oxide and thalium dioxide combined.

118.    According to Contract No. 004290-S between Fansteel and Philipp Brothers dated August 10, 1984 and September 4, 1984, Philipp Brothers agreed to sell and arrange for delivery to Fansteel for processing at the Fansteel Site approximately 28,700 lbs. of tantalum pentoxide contained in Thaisarco tantalum slags meeting the following specifications: minimum 14.0% of tantalum pentoxide for the entire quantity and for any one lot; minimum 7.0% of columbium pentoxide; and 0.50% maximum for uranium oxide and thalium dioxide combined.

119.    According to Invoice No. 11-S-46217 dated December 26, 1984, Philipp Brothers sold and arranged for the delivery of 49 drums and 215 bags of natural tantalite concentrates to Fansteel for processing at the Fansteel Site, which contained 51,365.01 lbs. of tantalum pentoxide.

120.    According to Invoice No. 11-S-51004 dated June 5, 1985, Philipp Brothers sold and arranged for the delivery of 54,000 kgs. of artificial tantalum concentrates produced by GFE to Fansteel for processing at the Fansteel Site, which contained 12,069 kgs. or 26,607.56 lbs. of

tantalum pentoxide.

121.    According to Contract No. 006700-S between Fansteel and Philipp Brothers dated June 12, 1985, Philipp Brothers agreed to sell and arrange for delivery to Fansteel for processing at the Fansteel Site approximately 200,000 lbs. of tantalum pentoxide contained in tantalum raw materials, consisting of any combination of the following: (a) up to 100,000 lbs. of tantalum pentoxide contained in natural tantalum concentrates, with a minimum 20% of tantalum pentoxide on a lot-by lot basis, a 55% minimum of tantalum pentoxide and columbium pentoxide combined, a maximum 8% of titanium dioxide, a maximum 10% of tin (IV) oxide, a maximum 0.50% of uranium oxide and thalium dioxide combined, and a 0.50% maximum of water; (b) up to 100,000 lbs. of tantalum pentoxide contained in artificial tantalum concentrates, with a minimum 20% of tantalum pentoxide on a lot-by lot basis, a 20% minimum of columbium pentoxide, a maximum 0.50% of uranium oxide and thalium dioxide combined, a 0.25% maximum of water, a 0.20% maximum of total carbon, and a 0.12% maximum of free carbon; (c) up to 50,000 lbs. of tantalum pentoxide contained in struverite, with a minimum 9% of tantalum pentoxide on a lot-by lot basis, a 60% maximum of titanium dioxide, a maximum 0.50% of uranium oxide and thalium dioxide combined, and a 0.25% maximum of water; (d) up to 100,000 lbs. of tantalum pentoxide contained in granulated Thaisarco slags, with a minimum 14% of tantalum pentoxide for the entire quantity, a minimum 7% of columbium pentoxide, a maximum 0.50% maximum for uranium oxide and thalium dioxide combined, and a 5.00% maximum for water.

122.    According to a February 2, 1987 letter from Philipp Brothers to Fansteel, Philipp Brothers sold and arranged for the delivery of approximately 673,696 lbs. gross of tantalum slag in 723 drums to the Fansteel Site for processing in early February 1987, pursuant to Contract No.

011922-S between Fansteel and Philipp Brothers.

123.    According to Invoice No. 11-S-65030 dated March 17, 1987 and pursuant to

Contract No. 011922-S between Fansteel and Philipp Brothers, Philipp Brothers sold and

arranged for delivery to Fansteel for processing at the Fansteel Site tantalum slags, including

24,802.0 lbs. of tantalum pentoxide contained in 51,501.5 lbs. of natural tantalum concentrates,

77,307.1 lbs. of tantalum pentoxide contained in 358,247.0 lbs. of artificial tantalum

concentrates, 7,262.6 lbs. of tantalum pentoxide contained in 59587.7 lbs. of struverites, and

89,052.5 lbs. of tantalum pentoxide contained in 620,259 lbs. of granulated Thaisarco slags.

124.    According to Contract No. 011922-S between Fansteel and Philipp Brothers dated

January 5, 1987 and a letter from Philipp Brothers to Fansteel on the same date, Philipp Brothers

agreed to sell and arrange for delivery to Fansteel for processing at the Fansteel Site on April 1,

1987 approximately 200,000 lbs. of tantalum pentoxide contained in tantalum raw materials,

consisting of any combination of the following: (a) up to 100,000 lbs. of tantalum pentoxide

contained in natural tantalum concentrates, with a minimum 20% of tantalum pentoxide on a lot-

by lot basis, a 55% minimum of tantalum pentoxide and columbium pentoxide combined, a

maximum 0.50% of uranium oxide and thalium dioxide combined, and a 0.50% maximum of

water; (b) up to 100,000 lbs. of tantalum pentoxide contained in artificial tantalum concentrates,

with a minimum 20% of tantalum pentoxide on a lot-by lot basis, a 20% minimum of columbium

pentoxide, a maximum 0.50% of uranium oxide and thalium dioxide combined, a 0.25%

maximum of water, a 0.20% maximum of total carbon, and a 0.12% maximum of free carbon;

(c) up to 50,000 lbs. of tantalum pentoxide contained in struverite, with a minimum 9% of

tantalum pentoxide on a lot-by lot basis, a 60% maximum of titanium dioxide, a maximum

0.50% of uranium oxide and thalium dioxide combined, and a 0.25% maximum of water; (d) up

to 100,000 lbs. of tantalum pentoxide contained in granulated Thaisarco slags, with a minimum 14% of tantalum pentoxide for the entire quantity, a minimum 7% of columbium pentoxide, a maximum 0.50% maximum for uranium oxide and thalium dioxide combined, and a 5.00% maximum for water.

125.    Phibro was founded in 1914, originally as Philipp Brothers. In the 1960s, Phibro became part of Engelhard Minerals & Chemicals Corp., but it was spun off in 1981 to become Phibro Corp.

126.    Phibro Corp. acquired Salomon Brothers in 1981 and the company was known as Phibro-Salomon until 1986, when Salomon won control and the corporate name became Salomon Inc.

127.    In 1998, through the Citigroup/Travelers Merger, Phibro LLC f/k/a Philipp Brothers, Inc. became the commodity trading subsidiary of Citigroup.

128.    In 2009, Citigroup sold Phibro LLC to Occidental Petroleum Corporation.

129.    By letter dated June 17, 2015, Plaintiff notified Phibro LLC f/k/a Philipp Brothers, Inc. of its alleged liability under CERCLA at the Fansteel Site and demanded that Phibro LLC f/k/a Philipp Brothers, Inc. pay its equitable share of past and future response costs incurred and to be incurred by Plaintiff at the Fansteel Site.

130.    In response to Plaintiff's June 17, 2015 demand letter, Stephen E. Fitzgerald, Senior Environmental Counsel for Glenn Springs Holdings, Inc., a subsidiary of Occidental Petroleum Corporation, indicated in a July 8, 2015 letter that all information provided by Plaintiff had been provided to Citigroup and that all further correspondence regarding the Fansteel Site and Phibro LLC or Philipp Brothers should be directed to in-house counsel for Citigroup.

131.    Citigroup is the legal successor to Phibro LLC f/k/a Philipp Brothers, Inc. and is the party responsible for the contributions of hazardous substances to the Fansteel Site by Philipp Brothers.

132.    To date, Citigroup has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

### b.    Union Carbide

133.    According to the records maintained and in the possession of Fansteel relating to Union Carbide, from at least 1968 through 1979, Union Carbide entered into multiple agreements with Fansteel to sell and arrange for delivery materials containing hazardous substances owned or possessed by Union Carbide to the Fansteel Site for treatment and disposal.

134.    These records, comprising contracts, memoranda, communications, shipping transport records and invoices, reflect Union Carbide arranged for the supply of materials containing hazardous substances that were arranged for treatment and for disposal and that were arranged for transport for treatment and for disposal at the Fansteel Site for conversion (treatment) by Fansteel into useful products, namely the tantalum and columbium that Fansteel was able to extract from Union Carbide-arranged materials for which content Fansteel paid Philipp Brothers.

135.    These records reflect arrangements through which title to the entire shipment of Union Carbide-arranged materials were transferred by Union Carbide to Fansteel, the payment by Fansteel being based upon the weight of tantalum and columbium Fansteel was able to extract and convert from Union Carbide-arranged materials, and the lack of arrangements for the return of residues after treatment of Union Carbide-arranged materials by Fansteel, reflect Union Carbide's understanding that the residues were not a useful product and reflect Union Carbide's

intent to arrange for transport for Fansteel's treatment and disposal of materials containing hazardous substances at the Fansteel Site, which records comprise at least of the following arrangements detailed in Paragraph Nos. 136-54 *infra* without further discovery.

136. According to a May 20, 1968 letter from Union Carbide to Fansteel, a May 30, 1970 letter from Fansteel to Union Carbide, and a May 26, 1970 Fansteel inter-office correspondence, in April 1968, Union Carbide sold and arranged for delivery 50 tons of Thailand tin slags to Fansteel for processing at the Fansteel Site under Fansteel's purchase order no. 87026, which Thailand tin slags were to contain 11,484 lbs. of tantalum pentoxide.

137. According to the same May 30, 1970 letter from Fansteel to Union Carbide and the same May 26, 1970 Fansteel inter-office correspondence, under a further agreement between Union Carbide and Fansteel in October 1968, Union Carbide sold and arranged for delivery additional Thai slags to Fansteel for processing at the Fansteel Site that contained 25,000 lbs. of tantalum pentoxide.

138. According to a Fansteel inter-office correspondence dated December 18, 1968, the contract then in existence between Union Carbide and Fansteel called for the conversion of 20,000 lbs. of Thai slags from Union Carbide to 10,000 pounds of FD powder processed by Fansteel; an additional 5,000 lbs. of Thai slags from Union Carbide; and a return from Fansteel to Union Carbide 12,750 lbs. of columbium oxide contained in such Thai slags.

139. According to a Fansteel inter-office correspondence dated February 21, 1969 related to Muskogee Receiving Report No. 8-9966, Union Carbide sold and arranged for delivery the following two Thailand tin slag lots to Fansteel for processing at the Fansteel Site pursuant to an October 28, 1968 agreement between Fansteel and Union Carbide: (1) 97,982 lbs. contained in 118 drums; and (2) 106,812 lbs. in 128 drums (51 lbs. of tare weight for each drum).

140.    According to a June 23, 1969 letter from Fansteel to Union Carbide, the third part of the then-existing agreement between Union Carbide and Fansteel was part of the agreement for Fansteel to process 200,000 lbs. of Thai slags from Union Carbide to FD powder and columbium oxide.

141.    According to an August 12, 1969 agreement between Union Carbide and Fansteel that states on its face that it continued to December 31, 1971, Union Carbide agreed to sell and arrange for delivery to Fansteel for processing at the Fansteel Site sufficient Thailand tantalum-bearing tin slags (or "Thai slags") tantalum slags to allow Fansteel to process sufficient capacitor grade tantalum powder to meet Fansteel's requirements to sell specific quantities of such tantalum powder to Union Carbide (as specified in the agreement).

142.    According to a Fansteel inter-office correspondence dated March 10, 1971, it was necessary for Union Carbide to sell and arrange for delivery 109,200 lbs. of Thai slags to Fansteel in 1971 for Fansteel to comply with its obligations to supply sufficient tantalum powder under the then-existing agreement between Fansteel and Union Carbide.

143.    According to an April 1, 1971 letter agreement between Union Carbide and Fansteel, the August 12, 1969 agreement between Union Carbide and Fansteel was amended to state that Union Carbide would sell and arrange for delivery to Fansteel for processing at the Fansteel Site four equal shipments of Thai slags prior to December 31, 1971 in steel drums or other containers suitable for shipment that conformed to the following specifications: 11.0% minimum tantalum pentoxide; and 7.0% minimum columbium oxide.

144.    According to a May 12, 1971 letter from Fansteel to Union Carbide, the parties agreed that Union Carbide would sell and arrange for delivery to Fansteel for processing at the Fansteel Site 50,000 lbs. of Thai slags by July 1, 1971 and the balance of Union Carbide's Thai

slag requirement for 1971 by September 1, 1971.

145.    According to a Fansteel inter-office correspondence dated June 25, 1971, Union Carbide then owned a majority interest in Thaisarco and the then-current Chairman of the Board of Thaisarco was a Union Carbide employee that was retiring in October 1971.

146.    According to a December 20, 1971 agreement between Union Carbide and Fansteel, Union Carbide agreed to sell and arrange for delivery to Fansteel for processing at the Fansteel Site Thaisarco slags that conformed to the following specifications: 11.0% minimum per lot, 12.0% minimum in aggregate per quarterly delivery installment of tantalum pentoxide; 7.0% minimum columbium oxide; and 5.0% maximum moisture per lot.

147.    According to a Fansteel inter-office correspondence dated December 21, 1971, the December 20, 1971 agreement between Union Carbide and Fansteel was for the supply of Thaisarco slags from Union Carbide to Fansteel for 1972 and 1973, and also 1974 and 1975 if extended by Fansteel in January 1973 and January 1974, respectively.

148.    According to a June 20, 1972 letter from Fansteel to Union Carbide and attachment thereto entitled "THAI SLAGS – SECOND QUARTER RECEIPTS," Union Carbide sold and arranged for delivery to Fansteel for processing at the Fansteel Site nine lots of Thai slags totaling 808,988 lbs. and containing 107,790.99 lbs. of tantalum pentoxide in the second quarter of 1972.

149.    According to a September 13, 1972 letter from Union Carbide to Fansteel, Union Carbide made new arrangements for handling the business management and marketing of Thaisarco slag and the Thaisarco slag responsibility was transferred to Billiton Trading Company, an affiliate of Union Carbide and Billiton Maatshappij N.V. who also shared ownership at the time of the Thailand Smelting and Refining Company, and that Union Carbide

continued to retain a substantial interest in this area under the terms of the Union Carbide-Fansteel Thaisarco Slag Supply Contract in place at the time, which contract Union Carbide was assigning to Billiton Trading Company, Inc. pursuant to Paragraph 9.A. of that contract.

150. According to Purchase Order No. 71743 with a July 12, 1974 order date, Union Carbide sold and arranged for delivery to Fansteel for processing at the Fansteel Site the following materials to be delivered in August 1974: 8,770 lbs. of tantalum pentoxide contained in upgraded Malaysian slags Grade T with approximately 28% tantalum pentoxide; 3,387 lbs. of tantalum pentoxide contained in natural tantalite ore with 35% tantalum pentoxide plus 35% columbium oxide; 3,140 lbs. of tantalum pentoxide contained in natural columbite ore with 24% tantalum pentoxide plus 46% columbium oxide; 2,034 lbs. of tantalum pentoxide contained in Nigerian columbite ore with 12.56% tantalum pentoxide plus 35.8% columbium oxide; 2,000 lbs. of tantalum pentoxide contained in Thai slags with 12% tantalum pentoxide plus 7% columbium oxide; 5,000 lbs. of tantalum scrap Grade I; and 10,000 lbs. of tantalum scrap Grade II.

151. According to various 1974 receiving reports, Union Carbide sold and arranged for delivery to Fansteel for processing at the Fansteel Site the following materials on the following dates: 28 drums of grade T columbite received on August 22, 1974 with a combined gross weight of 37,615 lbs.; 24 drums of tantalite ore received on September 4, 1974 with a combined gross weight of 24,517 lbs.; 15 drums of tin slag received on September 5, 1974 with a combined gross weight of 15,000 lbs.; 19 drums of tin slag received on September 24, 1974 with a combined gross weight of 19,934 lbs.; 9 drums with a combined gross weight of 5,230 lbs. received on October 14, 1974 consisting of 3,942 lbs. of sintered gray TA anodes, 761 lbs. of un sintered TA wire, and 174 lbs. of un sintered TA sheet & rod; 14lbs. of sintered TA anodes, 2

lbs. of unsintered TA scrap, and 106 lbs. of TA wire on October 28, 1974; 6 drums of tantalum

powder scrap, 2 drums of sintered TA anodes scrap, and 10 drums of sintered TA scrap on

October 29, 1974 with a combined gross weight of 10,936 lbs.

152.    According to a January 27, 1975 letter from Fansteel to Hurdman and Cranstoun,

Certified Public Accountants, Fansteel was holding the following materials for the account of

Union Carbide sold and arranged for delivery by Union Carbide to Fansteel for processing at the

Fansteel Site as of November 30, 1974: 31,324 lbs. of tantalum ore received on August 22, 1974;

23,200 lbs. of tantalum ore received on September 4, 1974; 13,699 lbs. of tantalum ore received

on September 5, 1974; 19,934 lbs. of tantalum ore received on September 24, 1974; 4,994 lbs. of

tantalum scrap received on October 14, 1974; and 10,155 lbs. of tantalum scrap received on

October 29, 1974.

153.    According to a Receiving Report dated August 29, 1978, on December 8, 1978,

Union Carbide sold and arranged for delivery to Fansteel for processing at the Fansteel Site Thai

slags and granular residues containing tantalum pentoxide and columbium oxide.

154.    According to four different shipping memorandums, Union Carbide sold and

arranged for delivery to Fansteel for processing at the Fansteel Site the following materials on

the following dates: Lot No. 85952 shipped on November 6, 1978 consisting of 4 drums of Thai

slags with a combined net weight of 2,765 lbs.; Lot No. 85953 shipped on November 6, 1978

consisting of 79 drums of tantalum residue with a combined net weight of 43,520 lbs. and

another 80 drums of tantalum residue with a combined net weight of 36,025 lbs.; Lot No. 85953

shipped on November 17, 1978 consisting of 84 drums of tantalum residue with a combined net

weight of 40,012 lbs. and another 84 drums of tantalum residue with a combined net weight of

38,152 lbs.; and Lot No. 85953 shipped on November 21, 1978 consisting of 49 drums of

tantalum residue with a combined net weight of 26,357 lbs. and another 50 drums of tantalum residue with a combined net weight of 28,900 lbs.

155.    To date, Union Carbide has not paid any of the Total Response Costs incurred and to be incurred by Fansteel and FMRI at the Fansteel Site.

## COUNT I

## **CONTRIBUTION UNDER CERCLA**

156.    Plaintiff realleges and incorporates by reference Paragraph Nos. 1 through 155 of this Complaint, as if fully restated herein.

157.    Sections 113(f)(1) and (3)(B) of CERCLA, 42 U.S.C. §§ 9613(f)(1) and (3)(B), provide, in relevant part, that:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a)....

> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement....

158.    Section 107(a)(3) – (4) of CERCLA, 42 U.S.C. §§ 9607(a)(3) – (4), provide, in relevant part, that:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section --

> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

> (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for -- (A) all costs of removal or remedial action incurred by the United States Government

or a State or an Indian Tribe not inconsistent with the national contingency plan;
(B) any other necessary costs of response incurred by any other person consistent
with the national contingency plan; (C) damages for injury to, destruction of, or
loss of natural resources, including the reasonable costs of assessing such injury,
destruction, or loss resulting from such a release; and (D) the costs of any health
assessment or health effects study carried out under section 9604(i) of this title.

159.   "Disposal" is defined in CERCLA Section 101(29) by reference to the Solid

Waste Disposal Act ("SWDA"). 42 U.S.C. § 9601(29). The SWDA defines "disposal" as "the

discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or

hazardous waste into or on any land or water so that such solid waste or hazardous waste or any

constituent thereof may enter the environment or be emitted into the air or discharged into any

waters, including ground waters." 42 U.S.C. § 6903(3).

160.   "Facility" is defined in CERCLA Section 101(9) as "any building, structure,

installation, equipment, pipe or pipeline" or "any site or area where a hazardous substance has

been deposited, stored, disposed of, or placed...." 42 U.S.C. § 9601(9).

161.   "Hazardous substance" is defined in CERCLA Section 101(14) by reference to

other federal statutes and by reference to a list of substances published by EPA at 40 C.F.R. §

302.4. 42 U.S.C. § 9601(14).

162.   "Person" is defined in CERCLA Section 101(21) as "an individual, firm,

corporation, association, partnership, consortium, joint venture, commercial entity, United States

Government, State, municipality, commission, political subdivision of a State, or any interstate

body." 42 U.S.C. § 9601(20).

163.   "Release" is defined in CERCLA Section 101(22) as "any spilling, leaking,

pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or

disposing into the environment (including the abandonment or discarding of barrels, containers,

and other closed receptacles containing any hazardous substance or pollutant or contaminant)...." 42 U.S.C. § 9601(22).

164.    "Response" is defined in CERCLA Section 101(25), and includes "removal" actions, "remedial" actions, and enforcement activities related thereto. 42 U.S.C. § 9601(25).

165.    The Fansteel Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

166.    There has been a "release" and/or a threatened "release" of "hazardous substances" at the Fansteel Site which has caused the incurrence of "response costs" by Plaintiff, within the meaning of Sections 101(22), 101(14) and 107 of CERCLA, 42 U.S.C. §§ 9601(22), 9601(14) and 9607.

167.    Plaintiff is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

168.    Both Citigroup and Union Carbide are a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

169.    Pursuant to CERCLA, 42 U.S.C. §§ 9607(a)(3) and/or 9607(a)(4), both Citigroup and Union Carbide are liable as an arranger or generator of materials containing hazardous substances, which materials were treated and/or disposed at the Fansteel Site; and/or a transporter of hazardous substances who selected the Fansteel Site for the treatment and/or disposal of such hazardous substances, and who transported such hazardous substances to the Site.

170.    As a result of the release and threatened release of hazardous substances at or from the Fansteel Site, Plaintiff has incurred and will continue to incur costs of "response," as that term is defined by Section 101(25) of CERCLA, 42 U.S.C. § 9601(25).

171.     Plaintiff and Fansteel have resolved their liability to EPA for matters covered in the ESA.

172.     Both Citigroup and Union Carbide are liable parties under CERCLA, but have not resolved their liability to Plaintiff, Fansteel, or the EPA.

173.     To date, Plaintiff and Fansteel have been compelled to incur and/or otherwise pay over $25 million in response costs at the Fansteel Site.

174.     Plaintiff and Fansteel are entitled to contribution from both Citigroup and Union Carbide under Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for their respective equitable shares of the Total Response Costs and damages incurred by FMRI and Fansteel, including applicable interest as provided for in Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

WHEREFORE, Plaintiff Fansteel Metals, Inc. f/k/a FMRI, Inc., on its own behalf and as assignee of Fansteel, Inc., respectfully requests that this Court enter a judgment in its favor and against both Citigroup and Union Carbide finding that they are each liable under CERCLA and are obligated to pay for their equitable shares of the Total Response Costs, including appropriate pre-judgment interest, associated with the Fansteel Site. Plaintiff further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such other relief as the Court may deem just and appropriate under the circumstances.

## COUNT II

## <u>DECLARATORY RELIEF UNDER CERCLA</u>

175.     Plaintiff realleges and incorporates by reference Paragraph Nos. 1 through 174 of this Complaint, as if fully restated herein.

176.     There is a present and actual controversy between Plaintiff and both Citigroup and

Union Carbide concerning their respective rights and obligations with respect to the response costs associated with the Fansteel Site.

177.    Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), provides, in relevant part, that:

> In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

178.    Plaintiff seeks a declaratory judgment under Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), against both Citigroup and Union Carbide holding each of them liable for their respective equitable shares of response costs, that will be binding in any subsequent action to recover further response costs.

179.    Plaintiff, on its own behalf and as assignee of Fansteel, is entitled to judgment against both Citigroup and Union Carbide for past and future response costs incurred in connection with the Fansteel Site.

WHEREFORE, Plaintiff Fansteel Metals, Inc. f/k/a FMRI, Inc., on its own behalf and as assignee of Fansteel, Inc., respectfully requests that this Court enter a declaratory judgment against both Citigroup and Union Carbide finding that they are each liable under CERCLA and are obligated to pay for their equitable shares of the Total Response Costs associated with the Fansteel Site. FMRI further requests that this Court award interest and costs of suit, including reasonable attorney's fees and consultant fees as permitted by law; and order any such relief as the Court may deem just and appropriate under the circumstances.

Dated:  December 14, 2022               Respectfully submitted,

THE JUSTIS LAW FIRM LLC

Gary D. Justis            E.D. Okla. ID 56723CO
P.O. Box 3408
201 Elk Ave., Unit B
Crested Butte, CO  81224
Telephone:  (970) 248-8360
Facsimile:  (970) 248-8386
Email:  gjustis@justislawfirm.com

ATTORNEYS FOR PLAINTIFF FANSTEEL
METALS, INC. F/K/A FMRI, INC.